UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | |
|---|---|
| DEBRYANT BEATTY, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 5: 18-607-DCR |
| | ) |
| V. | ) |
| | ) |
| FRITO-LAY, INC., | ) **MEMORANDUM OPINION** |
| | ) **AND ORDER** |
| Defendant. | ) |

*** *** *** ***

Plaintiff DeBryant Beatty claims that that his employer, Defendant Frito-Lay, Inc.,[1] subjected him to a hostile work environment and refused to consider him for a promotion because of his race. He filed suit against Frito-Lay in the Fayette County Circuit Court alleging violations of the Kentucky Civil Rights Act ("KCRA"), K.R.S § 344.010, *et seq.* Frito-Lay removed the case to this Court pursuant to 28 U.S.C. § 1332. Following the deadline for completing discovery, the defendant moved for summary judgment. Because there is no evidence indicating that Frito-Lay discriminated against Beatty in violation of the KCRA, its motion for summary judgment will be granted.

I.

Frito-Lay hired Beatty, who is African American, as a Route Sales Associate ("RSA") in June 2010. [Record No. 29-1, p. 2] Beatty eventually was promoted to his current position

---

[1] Frito-Lay, Inc. reports that Beatty's actual employer is Rolling Frito-Lay Sales, L.P. [Record No. 29, p. 1] Nevertheless, it has defended the action and has not formally requested that Rolling Frito-Lay Sales, L.P. be substituted in its place.

- 1 -

of Route Sales Representative ("RSR"). [Record No. 29-2, p. 1] As an RSR, Beatty is responsible for selling and delivering Frito-Lay products to customer stores, merchandising products onto customers' shelves, and removing stale products from customers' stores. *Id.*

Beatty acknowledged during his deposition that he had received a copy of Frito-Lay's RSR Handbook, which includes a formal Corrective Action Process that governs employee discipline. [Record No. 29-1, pp. 5-6] Step 1 of the process consists of a "written reminder," which remains active in the employee's personnel record for six months. [Record No. 29-2, p. 5] Step 2 is a "written warning," which remains active for nine months. *Id.* at p. 6. Step 3 is a "final written warning," which also remains active for nine months. Step 4 is termination. *Id.* The handbook also includes an Internal Complaint and Appeal Procedure under which employees may challenge disciplinary actions taken against them. *Id.* Beatty testified that he was unfamiliar with the appeal process, but acknowledged that it was part of the handbook he had received. [Record No. 29-2, p. 8]

Beatty received a "step 1" written reminder from District Sales Leader ("DSL") Jackie Colgate on July 14, 2011, which he did not appeal. [Record No. 29-1, pp. 8-9] He received a "step 2" written warning from Colgate on September 20, 2011, for "having unsellables or, in effect, stale product out in the market." *Id.* at p. 9. Beatty refused to sign the written warning, but did not appeal it. *Id.* at p. 9. Beatty received an additional step 1 write-up on February 21, 2018, due to the presence of stale products in a store on his route. Again, he did not appeal. *Id.* at pp. 11-12.

Beatty learned from another RSR that a new Route Sales Specialist ("RSS") position was becoming available during the summer of 2018. *Id.* at p. 18. The RSS position was a temporary, six-month promotion for an existing RSR. [Record No. 29-2, p. 1] An RSS

performs many of the same duties as an RSR, but also covers open routes; works with other RSRs to increase sales and improve service; mentors and trains newly-hired RSAs; and works with and develops full-time merchandisers. Minimum qualifications for the RSS position included: experience/skill with Frito-Lay routes; being willing and able to fulfill travel needs; a positive attitude; leadership mentality; no safety incidents within the past 12 months; and **no active discipline**. [Record No. 29-2, p. 13]

On July 24, 2018, former Zone Business Manager Sarah Rediford e-mailed several district supervisors, including Beatty's supervisor Alex Fezkco, regarding interviews for the RSS position. [Record No. 29-2, p. 22] She wrote: "On next Tuesday, July 31st, [Zone Sales Leader] Mike [Stacy] and I would like to meet with anyone that is interested in becoming a Sales Specialist for the Lexington DC area. We have received the list below of those interested. Please let us know the best time for them to meet with us next Tuesday. . . ." *Id.* The following individuals' names were listed in Rediford's e-mail: Javier Ortiz; Tilford Garrison; Jordan Jennings; Steve Burchell; Scott Robinson; Kendall Cloyd; Tim Adkins; Josh Owens; and Mike Faulkner. *Id.* Clinton Carrington, an African American employee, was subsequently added to the list, but later withdrew from consideration. *Id.* at p. 2.

Notwithstanding his active step of discipline, Beatty notified Feczko, on or about July 25, 2018, that he would like to be considered for the RSS position. Feczko advised Beatty that he would contact Stacy and Rediford to schedule an interview for him. According to Beatty, Feczko contacted him on July 27, 2018, and confirmed his interview for the following Tuesday at 3:30 p.m. [Record No. 32-5, p. 5]

Feckzo e-mailed Stacy on the evening of July 30, 2018, advising that Beatty wished to interview for the RSS position. [Record No. 29-2, p. 24] Stacy responded within minutes,

asking: "Did you give him any direct feedback on his route performance?" *Id.* Stacy went on to state that "[the interviews] were scheduled in advance and [sic] would be happy to discuss with him the potential of backfilling one of the positions in the future." *Id.* Feczko responded that he had given Beatty feedback on his performance but "want[ed] to give him the same opportunity as the other RSRs to interview." *Id.* at p. 24. Feczko further explained: "I let my whole team know of the position but didn't approach [Beatty] directly about it because I didn't think he was the best candidate. . . ." *Id.*

Beatty testified that when he arrived for his interview around 3:00 p.m. on Tuesday, July 31, 2018, both Rediford and Feczko were present. [Record No. 29-1, p. 22] According to Beatty, Mike Faulkner walked out of the interview room and said, "DeBryant, you're up." Upon approaching the interview room, Rediford shook Beatty's hand and said, "DeBryant, I know you're up here to interview. Unfortunately, we've got all of our candidates. . . but this position will be available again in six months." Bewildered, Beatty said, "okay." *Id.*

At that point, Beatty and Feczko went into Feczko's office, where Beatty expressed his disappointment and confusion about not receiving an interview. Feczko conceded that he did not think Beatty was the best candidate for the position, but acknowledged Beatty's frustration concerning the situation. The two men did not discuss Beatty's active step of discipline and it appears that Feczko was unaware of it at the time. Contrary to company policy, Beatty secretly recorded the conversation. *Id.* at p. 22-23.

In August 2018, Scott Robinson and Josh Owens (both Caucasian males) were selected for the RSS positions. [Record No. 29-2, p. 2] Neither was on an active step of discipline from the date of his interview to the date he started the RSS position. Robinson, however, was on a medical leave of absence during the application and interview period, and was not cleared

to return to work until August 12, 2018—the date he began the RSS position. *Id.* Robinson completed his first sixth-month term as an RSS and elected to continue on to a second term. *Id.* Owens completed his first term and elected to return to the position of RSR. Owens bid on route 49882 while he was still an RSS, but he was not awarded the route until January 27, 2019, when his RSS term ended. *Id.*

Because Owens did not extend his RSS position into a second term, Frito-Lay posted a newly-vacant RSS position for the Lexington Sales Zone in January 2019. *Id.* And despite being aware of the position, Beatty did not apply. *Id.*

## II.

Summary judgment is appropriate where the pleadings and discovery materials on file show that there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corp. of President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

The moving party has the burden of showing that at least one essential element of the plaintiff's claims is not supported by legally sufficient evidence. *Celotex*, 477 U.S. at 331. To defeat the motion, the nonmoving party must then "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Front Row Theatre, Inc. v. American Mfr's. Mut. Ins. Cos.*, 18 F.3d 1343, 1346 (6th Cir. 1994). In reviewing a motion for summary judgment, the Court views the evidence in the light most

favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

## III.

### A. Hostile Work Environment

The Kentucky Civil Rights Act, K.R.S. § 344.040, mirrors Title VII of the Civil Rights Act of 1964, and discrimination claims brought under the KCRA are analyzed the same way as those brought under Title VII. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000). One way that a plaintiff may prove a violation of the KCRA is by showing that his employer's unlawful discrimination has created a hostile work environment.

A hostile work environment exists when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To prove his claim, the plaintiff must establish that he is a member of a protected class; was subject to unwelcomed harassment; the harassment was based on his race; the harassment unreasonably interfered with the plaintiff's work performance by creating a work environment that was intimidating, hostile, or offensive; and his employer is liable. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007). The plaintiff must show not only that he perceived the environment to be abusive but that "a reasonable person would find the environment objectively hostile." *Williams v. Gen. Motors Co.*, 187 F.3d 553, 568 (6th Cir. 1999).

Beatty has failed to identify any instances of harassment or factors indicative of a hostile or abusive work environment. In response to the defendant's motion for summary judgment, he largely ignores his hostile-work-environment claim. The two proffered

"examples" of abusive conduct are as follows: his supervisor once called his doctor to verify that he had attended a medical appointment and Mike Stacy would not change his schedule to Monday-through-Friday without putting the route up for bid, despite having done so for unspecified white RSRs. [Record No. 32, p. 4] Beatty conceded that he did not recall his supervisors ever mentioning his race. [Record No. 29-1, p. 27] Instead, he perceived that he and other African American employees were being discriminated against based on the lack of minorities holding supervisor positions.

In determining whether a workplace was hostile, courts and juries must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's performance." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 309 (6th Cir. 2016) (citation and alterations omitted). Put simply, these two "incidents" do not constitute the type severe and/or pervasive conduct that could reasonably constitute an abusive or hostile work environment.

But even if these events were considered abusive or hostile, Beatty has failed to connect them to his protected status. He testified that he "asked a couple of other employees" whether the defendant had called their doctors, but there is nothing to suggest that the defendant's alleged phone call to Beatty's physician was racially motivated. [*See* Record No. 32-5, p. 3] Likewise, he testified that there had been "numerous occasions" where "a lot of other employees" had been able to change their routes without putting the route up for bid although Mike Stacy required him to do so. *Id.* at p. 4. Beatty fails to identify any of the other employees or explain why he believes this incident was connected to his race. Accordingly, summary judgment will be granted in the defendant's favor on this claim.

### B. Failure to Consider Plaintiff for Promotion

The failure to consider an employee for a promotion because of his race constitutes a violation of the KCRA. *See* K.R.S. § 344. 040(1)(a). To avoid summary judgment on the failure-to-promote claim, Beatty must provide either direct or circumstantial evidence of discrimination. *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995). Direct evidence of discrimination is evidence that, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Ondricko v. MGM Grand Detroit,* LLC, 689 F.3d 642, 649 (6th Cir. 2012). Beatty concedes that his supervisors never made any statements concerning his race. Instead, he contends that "there has never been a black person in management in the Lexington Zone," and this constitutes direct evidence of discrimination. [Record No. 32, p. 9] However, it is well-settled that "direct evidence of discrimination cannot be based on rumors, conclusory allegations, or subjective beliefs." *Hein v. All American Plywood Co., Inc.*, 232 F.3d 482, 488 (6th Cir. 2000).

When circumstantial evidence is used to prove a failure-to-promote claim under the KCRA, the familiar burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1972) applies. The plaintiff has the initial burden of establishing a prima facie case that: "(1) he is a member of a protected class; (2) he applied and was qualified for a promotion; (3) he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions." *Johnson v. Box USA Grp., Inc.*, 208 F. Supp. 2d 737, 740 (W.D. Ky. 2002) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000)). If the plaintiff establishes a prima facie case, the defendant may rebut the presumption of discrimination by "proffering a legitimate, nondiscriminatory reason for its decision." *Id.* If the defendant is able to do so, the plaintiff

then bears the burden of showing that the defendant's proffered reason is a pretext for discrimination.

The defendant argues that Beatty cannot satisfy his initial burden because he cannot show that he was qualified for the position or that similarly-situated employees who were not members of the protected class were permitted to interview for the position. It is undisputed that "no active discipline" was a minimum qualification for the RSS position. [*See* Record No. 29-2, p. 13] It is also undisputed that Beatty received a written warning on February 21, 2018, which remained active until August 21, 2018. Accordingly, Beatty was not qualified for the position at the time of the July 31, 2018, interviews or at the time the RSS positions were awarded to Robinson and Owens on August 12, 2018. *See id.* at p. 2.

Beatty argues that he was qualified for the position because his written warning expired on August 21, 2018, which happened to be the day Robinson began the position. However, the job listing states simply that qualified candidates must have "[n]o active discipline." *Id.* at p. 13. The commonsense meaning of this requirement is that eligible applicants could have no active discipline at the time they applied for the job. Beatty's version of the requirement adds language that is not there—i.e., no active discipline as of the position's start date. There is no indication that Frito-Lay had determined a start date for the RSS positions at the time it announced them. Under the plaintiff's line of reasoning, Frito-Lay would be required to consider candidates with active disciplinary actions and potentially hold the positions open for them until those candidates' disciplinary actions expired. This is nonsensical, as it essentially renders the "no active discipline" requirement moot.

"What the qualifications for a position are, even if those qualifications change, is a business decision, one courts should not interfere with [sic]. [The Court does] not tell

employers what the requirements for a job must be." *Schaffner v. Glencoe Park Dist.*, 256 F.3d 616, 620 (7th Cir. 2001). A minimum qualification for the RSS position was "no active discipline," and Beatty did not meet this requirement. Accordingly, he was not qualified for the position.

Beatty has also failed to establish that he was treated differently than other similarly-situated employees who were not members of the protected class. Frito-Lay's Human Resources Representative Christine Rockhill provided a declaration stating that none of the seven individuals interviewed for the RSS position was on an active step of discipline at the time of the interview. *Id.* at pp. 1-2. The plaintiff argues that the RSS position was "held" for Scott Robinson, who was on a medical leave of absence until August 12, 2018—but a medical absence is fundamentally different than a disciplinary action. And while the job posting explicitly states that candidates may not have an active step of discipline, it says nothing about being on medical leave during the interview period.

In an even more attenuated argument, Beatty contends that Josh Owens was permitted to bid on another position during the six months that he was an RSS. According to Beatty, Owens was awarded the position, which was "held for Owens for approximately one month" while he completed his six-month term as an RSS. Beatty reasons that, if he had been treated similarly, he could have interviewed for the RSS position on July 31, 2018, and started the position on August 21, 2018, after expiration of his disciplinary action. [Record No. 32, p. 11] Again, it is unclear how this argument relates to Beatty's prima facie case. Owens was not under a disciplinary action, and Beatty has not identified any rule which would have precluded Owens from bidding on another position while he was an RSS.

While failure-to-promote plaintiffs and "similarly-situated employees" need not have identical qualifications, they must have "similar qualifications." *Walker v. Commonwealth*, 503 S.W.3d 165, 175 (Ky. Ct. App. 2016). Here, Beatty's qualifications were dissimilar to every RSS candidate in that he was under an active step of discipline while the RSS candidates were not. Since this was an explicit minimum requirement for the position, it is a crucial distinction which placed Beatty on significantly different footing than his colleagues who received interviews.

Because the plaintiff has failed to make out a prima facie case of discrimination, the Court need not address the second and third prongs of the *McDonnell Douglas* inquiry. Accordingly, it is hereby

**ORDERED** as follows:

1. Defendant Frito-Lay, Inc.'s Motion for Summary Judgment [Record No. 29] is **GRANTED**.

2. This matter is **DISMISSED** and **STRICKEN** from the Court's docket.

Dated: December 20, 2019.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky